Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/28/2020 09:08 AM CDT

In re Trust of Margie E. Cook, deceased.
Lloyd Russo and Betty Russo, husband and wife,
appellants, v. Union Bank and Trust Co.,
Trustee of the Margie E. Cook
Revocable Trust, appellee.

___ N.W.2d ___

Filed July 14, 2020.    No. A-19-755.

1. **Trusts: Equity: Appeal and Error.** Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record.

2. **Judgments: Appeal and Error.** When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable.

3. ____: ____. An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the trial court where competent evidence supports those findings.

4. **Decedents' Estates: Appeal and Error.** An appeal from the county court's allowance or disallowance of a claim in probate will be heard as an appeal from an action at law. In reviewing a judgment of the probate court in a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. The probate court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous.

5. **Decedents' Estates: Wills: Trusts: Judgments: Appeal and Error.** The interpretation of the words in a will or a trust presents a question of law. When reviewing questions of law in a probate matter, an appellate

court reaches a conclusion independent of the determination reached by the court below.

6. **Actions: Parties.** The purpose of Neb. Rev. Stat. § 25-301 (Reissue 2016) is to prevent the prosecution of actions by persons who have no right, title, or interest in the cause.

7. **Trusts.** Where a trust is revocable, the settlor is in control of the trust.

8. **Trusts: Parties.** The plain language of Neb. Rev. Stat. § 30-3855(b) (Supp. 2019) suggests that the only real party in interest in a case involving a revocable trust would be the settlor of that trust, or perhaps one that represents the settlor's interests.

9. **Decedents' Estates.** A mere expectancy interest is insufficient to entitle a prospective heir to bring an action to recover property.

10. **Trusts.** Incapacity does not terminate a settlor's power to revoke a trust, though it might well affect the ability of the settlor to exercise that power.

11. **____.** Because incapacity does not affect the power to revoke a trust, a trust remains revocable until revoked, either by the settlor or by another acting in the settlor's stead.

Appeal from the County Court for Douglas County: Thomas K. Harmon, Judge. Affirmed.

Tiernan T. Siems, of Erickson & Sederstrom, P.C., for appellants.

Darren R. Carlson and Terry A. White, of Carlson & Burnett, L.L.P., for appellee.

Pirtle, Bishop, and Arterburn, Judges.

Pirtle, Judge.

### INTRODUCTION

Lloyd Russo and Betty Russo appeal from an order of the county court for Douglas County, finding that they lacked standing to assert a claim for the distribution of trust proceeds from the Margie E. Cook Revocable Trust. Based on this conclusion, the county court additionally denied the Russos' motion to disallow attorney fees. The county court also found that the issue of Margie E. Cook's capacity was not relevant to the issue of standing.

## BACKGROUND

Union Bank and Trust Company (Union Bank), acting as trustee of the Margie E. Cook Revocable Trust, filed its petition for instruction in trust administration on September 6, 2018, requesting direction from the county court on how to distribute the proceeds from the sale of an Arizona condominium (condo) previously owned by Cook. On October 12, the Russos filed a motion to intervene and requested an order requiring Union Bank to distribute the trust proceeds from the Arizona condo to them, pursuant to a beneficiary deed executed in their favor by Cook in 2015. The Russos apparently also filed a separate civil complaint against Union Bank that same day, but that pleading is not contained in the record before us.

On October 25, 2018, Union Bank filed an objection to the Russos' motion to intervene, alleging that the Russos' civil complaint failed to state a claim and that the Russos nevertheless lacked standing to assert such claims. Alternatively, Union Bank sought to consolidate the Russos' civil complaint with the pending probate matter. The two matters were consolidated for a bench trial.

On March 8, 2019, the Russos filed a motion to disallow attorney fees, requesting the county court to order the law firm of Carlson & Burnett to disgorge fees previously paid to it. The Russos argued that one of the firm's attorneys, Adam Wintz, served as Cook's personal attorney and drafted certain documents at issue in the case and that therefore, Carlson & Burnett had an ethical conflict representing Union Bank and should not receive attorney fees in the matter.

On March 15, 2019, Union Bank filed a motion to dismiss the Russos' civil complaint against Union Bank, alleging that the Russos lacked standing as contingent beneficiaries of a revocable trust and that the probate court had exclusive jurisdiction over the matter. The civil court granted Union Bank's motion to dismiss, finding that it did not have subject matter jurisdiction over the Russos' claim.

A bench trial was held on June 25 and 26, 2019, regarding Union Bank's petition for instruction in trust administration and the Russos' motion to intervene.

John Atkins, vice president and senior trust officer of Union Bank, was called to testify on Union Bank's behalf. Atkins testified that he is responsible for administering fiduciary documents such as financial powers of attorney, conservatorships, revocable and irrevocable trusts, and "virtually any type of fiduciary capacity."

Atkins testified that Union Bank first became involved in Cook's affairs when he was contacted by Wintz, an attorney then with Elder Law of Omaha, who asked Atkins whether Union Bank would be willing to serve under a financial power of attorney for Cook. Atkins testified that he became aware Lloyd was serving as Cook's attorney in fact and that Atkins first met him in late June or early July 2017. Lloyd was coincidentally referred to Atkins and Union Bank as a possible replacement attorney in fact by an attorney in Bellevue, Nebraska.

A meeting was arranged between representatives of Union Bank and Cook at her assisted living residence at Brighton Gardens (Brighton) in Omaha, Nebraska, on July 7, 2017. Along with Atkins and his assistant, Wintz and Denise Craft were also present at the meeting. Atkins testified that Craft is a "transition specialist" for elder care whom he has worked with on a number of occasions since they met in the early 2000's. Atkins testified that Lloyd was present at the Brighton facility on that date, but he did not participate in the meeting.

Atkins testified that Cook was "very clear . . . that she was very upset with the Russos. She did not want them involved as beneficiaries of her estate, and she did not want them to receive the Scottsdale villa." He indicated that Cook appeared comfortable with him and that she was clear about her wishes regarding the condo and did not appear to be confused at the time.

A new financial power of attorney for Cook, naming Union Bank as Cook's agent, was signed at the July meeting. Atkins

indicated that Union Bank does not serve as agent under health care powers of attorney, but Cook asked Craft whether she would serve in that role, which Craft accepted. After the documents had been signed, Cook was taken back to her room and Lloyd entered the meeting to sign his resignation of all fiduciary positions he held for Cook.

At a later date, Atkins spoke to Lloyd regarding whether Cook had an estate plan in place. Lloyd indicated that Cook had worked with an Omaha attorney, Niel Nielsen, on an estate plan. Nielsen provided Atkins with Cook's last will and testament, her revocable trust, and a competency checklist he had completed with Cook.

Exhibit 8, the trust agreement for the Margie E. Cook Revocable Trust, dated March 9, 2017, was introduced. Article IX of the trust agreement provided that any interest in Cook's Arizona condo that she retained at her death was to go to the Russos.

Exhibit 9, an "execution checklist" signed by Cook and Nielsen on March 9, 2017, was the only information Atkins received related to Cook's competency at the time. Atkins testified that Cook appeared to him to be "cognitive in every respect" when she signed the power of attorney documents on July 7.

Exhibit 5, a beneficiary deed dated March 30, 2015, names the Russos as beneficiaries of Cook's Arizona condo. Atkins testified that exhibit 5 appeared to supersede a prior beneficiary deed dated May 18, 2012, naming "Jack E. Stewart" as beneficiary of the same Arizona condo. Exhibit 7, a last will and testament for Cook dated November 17, 2010, named "Lynn K. Scott M.D." as the beneficiary of the Arizona condo.

Atkins testified that exhibit 10 was a handwritten amendment to Cook's trust, which in essence states that Cook did not want the Russos to receive the Arizona condo at her death. That amendment is dated July 20, 2017, and was signed by Cook. Atkins testified that he received the handwritten amendment from Craft and was satisfied that it met the requirements for amending Cook's trust. Exhibit 11 reflected another

amendment to Cook's trust, under which Union Bank was to assume the position of trustee. Exhibit 12 is a revocation of the May 2012 beneficiary deed.

Atkins testified that Union Bank, as trustee, moved Cook's assets that otherwise would have been subject to probate into the trust. Prior to Union Bank's assuming the role of trustee, Cook told Atkins that she did not think she would ever return to Arizona. Atkins contacted a real estate agent to list the Arizona condo for sale because Union Bank "felt it was in [Cook's] best interest not to keep a piece of real estate that would be unoccupied." Atkins testified that the condo had costs associated with insurance, real estate taxes, homeowner association dues, and maintenance and upkeep if Cook retained the condo. Exhibit 13 is the settlement statement that was prepared once the Arizona condo was sold, and it reflects the $136,164.84 in net proceeds Union Bank received as trustee from the sale.

On cross-examination, Atkins testified that he did not become aware of any dementia or other memory problems with Cook until after July 7, 2017, when Union Bank took over under the financial power of attorney. Atkins conceded that he did not look further into competency issues after Union Bank became Cook's financial attorney in fact.

Atkins testified that he was not present when Craft drafted the handwritten trust amendment. He agreed that it was not Craft's role to be preparing documents that attempted to amend the trust. At no point during the July 2017 meeting did Cook mention that she had previously signed similar estate plan documents with Nielsen in March 2017. Atkins never conducted any sort of competency evaluation with Cook and was unable to say whether Wintz or Craft did so.

On redirect examination, Atkins testified that Union Bank did not have any concerns regarding Cook's competency after she had appointed Union Bank under the financial power of attorney because "if [Cook] became incapacitated at that time was not relevant to what [Union Bank's] role was as

attorney-in-fact and eventual trustee of her trust." At that point, Union Bank was already acting as attorney in fact under what it believed to be a valid document. Atkins perceived Cook to be competent during both the July 7 and July 20 meetings in 2017. He also did not believe that Lloyd raised any concerns about Cook's competency when they met in July 2017.

Craft, owner of Craft Lifestyle Management (CLM), testified that CLM works to transition special needs adults and senior citizens into accommodating living arrangements, whether by modifying their home or assisting with placement in other communities. Cook was referred to CLM in March 2017. Lloyd previously contacted CLM in December 2016, inquiring about the cost of assisted living for Cook. Craft was called upon to visit Cook at her Bloomfield apartment, an independent living apartment in Omaha. There, Craft found that Cook's medications were scattered throughout the apartment, there was nothing in the refrigerator, and there were moldy dishes in the sink and that in the living room, "there [was] nowhere to get through." Cook informed Craft that Lloyd was serving as her attorney in fact.

Craft testified that Lloyd made arrangements to move Cook to Brighton. Craft met with Lloyd at Brighton to have him sign paperwork allowing CLM to assist in the move. Lloyd brought Cook to Brighton the next day, but after moving some of Cook's belongings into her room, Craft discovered Cook sitting alone in the lobby, with a swollen hand. Craft contacted Brighton's director of nursing, and Cook was examined by Brighton's medical staff and taken to the hospital. The Russos were not contacted.

Craft testified that Cook requested a meeting in July 2017 regarding her powers of attorney. On July 7, Craft met with Cook, Wintz, Atkins, and Atkins' assistant to discuss Cook's health care power of attorney. Craft served as Cook's health care attorney in fact going forward. Craft testified that Cook was "very well-prepared" and "alert" throughout the meeting. According to Craft, Cook appeared to know where she was

and specifically asked that Craft serve as her health care agent. Craft testified that Lloyd was not present during the meeting when Cook's powers of attorney were discussed, but he came later after Cook left.

Craft testified that a note, introduced as exhibit 10, was handwritten by her except for Cook's signature. Cook asked Craft to write for her, but dictated the contents of the note, in which Cook indicated that she did not want the Russos to receive the Arizona condo, nor any of her other assets. Craft testified that Cook first began to express concerns about the Russos prior to the incident where she was left alone in the Brighton lobby. Cook asked Craft to take the note to Union Bank, which Craft did.

On cross-examination, Craft testified that she first became aware of Cook's dementia in September or October 2017, despite CLM's accompanying Cook to medical appointments since May. She testified that she "[w]ould have had no reason to" suspect Cook had a diagnosis of dementia any time prior to the July 2017 meeting. Craft acknowledged that she had access to Cook's medical information prior to July 2017, but did not avail herself of it.

Craft acknowledged that she had access to attorneys like Wintz and Atkins, but nevertheless assisted Cook in modifying her estate plan with the July 2017 handwritten note. Craft testified that she did not volunteer to fill Lloyd's role as medical power of attorney, despite knowing he was looking for a replacement, because it is not CLM's common practice to take on that role.

Union Bank next called Lloyd to testify. Lloyd testified that he and his wife, Betty, rented a condo in Arizona from mid-January to mid-March each year. The Russos first met Cook in Arizona approximately 17 years before her death. The Russos frequently attended concerts, parades, music festivals, and other activities with Cook.

Lloyd testified that he handwrote exhibit 5, a transfer-on-death deed dated March 30, 2015, purporting to transfer

Cook's Arizona condo to the Russos upon her death. He testi-
fied that Cook was visiting the Russos when she said, "'You
know, all these years, I come here and do things with you
guys. You guys come to Arizona. . . . I don't know why I
don't give you my condo.'" Lloyd was aware of the existing
transfer-on-death deed that would have given Cook's condo to
another individual.

In November 2016, Cook asked the Russos whether they
would be willing to serve as her attorney in fact. Lloyd testi-
fied that he believed Cook became incapacitated around June
2017 and that her doctor wanted her to enter assisted living,
but he was hesitant to force her into a living arrangement she
did not want.

Lloyd testified that he decided to resign as medical attorney
in fact after Cook moved to Brighton because of the number
of decisions he was responsible for regarding Cook. Lloyd
contacted Atkins at Union Bank to see if he and Union Bank
would be able to take on the role as financial attorney in fact.
Lloyd believed the July 7, 2017, meeting was to have Atkins
and Cook meet before Union Bank assumed its role, but he
said he was "blindsided" by the actual events that occurred.
Lloyd believed that Union Bank would take over the financial
power of attorney role and that Atkins had someone arranged
to fulfill the medical duties. He testified that he did not know
Craft was taking over under the health care power of attorney
until the meeting was over. Lloyd did not believe Craft should
serve as Cook's health care attorney in fact.

After Lloyd's testimony, Union Bank rested its case in chief.

Dr. Terry Davis was called to testify on behalf of the
Russos. Davis testified that he is a forensic psychiatrist and
also has a law degree. Davis described the practice of forensic
psychiatry as "any place where the legal system and the mental
health system overlap," including questions of competency in
legal matters.

Davis testified that he was provided with Cook's medi-
cal records, which he reviewed to formulate a diagnosis for

Cook in the time leading up to her death. Davis reviewed the medical records dated October 17, 2016, which indicated Cook was suffering from "'delusions . . . delirium'" and was sent to "'Angel's Home Health to evaluate and treat as indicated for increased delirium,'" "'confusion,'" and "'agitation and aggression.'" Davis was unable to determine from the medical records whether Cook was experiencing episodic or more continuous periods of delirium, but "she was clearly suffering from some significant mental impairment and cognitive impairment as far back as October of 2016." Davis testified that the records revealed additional evidence that Cook was experiencing a chronic and deteriorating form of dementia.

Davis noted Cook underwent a CT scan on October 8, 2017, which revealed "moderate atrophy" and "deterioration of her brain." Davis testified that agitation and aggression are common symptoms associated with Alzheimer's disease. A record from October 24, 2016, revealed that Cook "'continues to talk to her husband, who passed.'" Cook's husband had not been alive for nearly 20 years at that point.

Davis noted that as of March 7, 2017, Cook's memory was worsening, as evidenced by her prescription for "Namenda," a medication designed to assist with memory loss. Based on his review of Cook's medical records, Davis offered his professional opinion that Cook suffered from "dementia of the Alzheimer's type and that she was on a progressive downhill course" as of March 7. He stated that "it would be highly questionable whether or not she was competent to execute legal documents on that date or thereafter."

Davis further testified that someone suffering from Cook's condition "might have some brief periods where she would be more lucid than not in some areas, but that isn't necessarily going to make her competent to do things like execute a will, execute a trust, [or] consent to medical care." On April 18, 2017, Cook's records revealed she scored 13 out of 30 points on the "SLUMS test," one of several screening tests used to detect cognitive impairment. Davis testified that a score of

"anything below 14 [was] indicative of dementia." He testified that as more evidence supported a diagnosis of dementia and Alzheimer's disease for Cook over time, it became "less likely that there would be lucid intervals."

Davis testified that when conducting a competency evaluation for the execution of a will or trust, he will ask more detailed questions than those shown in the "execution checklist" performed by Cook's then-attorney, Nielsen. He testified that the contents of the checklist did not change his opinions as to Cook's diagnosis and competency at the time it was administered. A May 10, 2017, nursing note from Brighton indicated that Cook "'does not have the cognitive capability to make decisions per M.D.'" That same month, there was evidence of depression and suicidal thoughts by Cook, which Davis indicated "shows some serious mental disturbance."

Davis opined that a June 7, 2017, note from Cook's primary physician, Dr. Lynn Scott, "cemented" Cook's incapacity. Scott wrote that Cook "'doesn't have a good grasp on anything,'" and she further referenced Cook's need for a power of attorney and "'placement in a nursing home for skilled care, medication dispensing.'" Davis further opined that Cook would not have been competent to execute any financial documents after that date.

On cross-examination, Davis agreed that the presence of moderate atrophy on a CT scan does not necessarily mean an individual has dementia. He acknowledged that on March 28, 2017, Scott reported the findings of another physician who concluded Cook was competent to take care of her affairs. He also acknowledged that April 2017 medical entries reflected that Cook was "alert and oriented to self, but not to date." He noted that Scott wrote, on June 7, that Cook "appeared to have some lucid intervals" but also "cannot recall any facts." Davis agreed that there were findings by various medical professionals that Cook was alert and oriented, as well as findings to the contrary.

Nielsen testified that his law practice regularly involves working with wills, trusts, powers of attorney, and other areas of estate planning. Nielsen testified that he met Cook when she stopped by his office in October 2016. After their initial meeting, Nielsen took Cook on as a client and drafted her health care and financial powers of attorney in November 2016.

Nielsen testified that Lloyd was named the primary agent under both documents and that Betty was named the alternate agent. Coincidentally, the Russos were also clients of Nielsen's at the time. Nielsen testified that a health care power of attorney usually becomes effective upon a determination by a doctor that the individual has become incapacitated. He indicated that while Cook was his client, no doctor had determined that she was incapacitated.

Nielsen also drafted a revocable trust and "pour-over will" for Cook. Cook was designated the primary trustee under the trust, and in the event Cook could no longer serve in that role, Lloyd was named first successor trustee and Betty was second successor trustee. The trust designated specific gifts to certain individuals, with the residual assets to go to the University of Nebraska Foundation. The trust indicated that Cook's Arizona condo should be left to the Russos. At the time, a "transfer-on-death," or "beneficiary," deed leaving the condo to the Russos was in place.

Nielsen went through an "execution checklist" with Cook in order to verify she had the necessary capacity to execute the documents. Nielsen testified that he was satisfied that Cook was competent at the time and understood the documents she was signing. He testified that if he had further concerns regarding Cook's competency, he would have asked her to see a doctor and have an evaluation done.

Exhibit 31, a summary of Cook's medical records between October 17, 2016, and October 9, 2017, was introduced. Nielsen testified that if he had reviewed Cook's medical records on March 9, 2017, when she signed the documents, he likely

would have suggested that Cook seek a full evaluation by a physician. Nielsen testified that had a medical professional opined that Cook was not legally competent at the time, he would have relied on those opinions and would not have overseen the execution of the documents. Nielsen testified that, nevertheless, the documents he drafted for Cook did little to change the disposition of her property under previously drafted wills and beneficiary deeds. The purpose was to avoid any of Cook's assets being subject to probate. Nielsen testified that he did not have any contact with Cook after March 9.

Exhibit 8, the revocable trust agreement drafted by Nielsen and executed by Cook on March 9, 2017, was introduced into evidence. Exhibit 28, the last will of Cook drafted by Nielsen on that same date, was also introduced into evidence. Article IX of the revocable trust provides, as relevant here:

> Upon the death of the Settlor, the Trustee shall distribute the following bequests, which shall be net gifts after payment of all taxes, debts and expenses of the Settlor's estate:
>
> . . . .
>
> 2. Any interest the Settlor may own in [the Arizona condo], along with any contents thereof not otherwise disposed of by other provisions of this Trust, to [Lloyd] and [Betty], or the survivor of them, if living.

In reviewing Cook's prior estate plan, Nielsen was aware that the Arizona condo had previously been designated to another individual through a transfer-on-death deed. Nielsen was not concerned that the beneficiary designation for the condo had changed three times within a 5-year period. Nielsen previously had conversations with Lloyd about designating a corporate trustee, like Union Bank, but Lloyd did not ask Nielsen to make any changes to Cook's estate plan.

Edna James testified that she assisted elderly and disabled individuals by purchasing their groceries, preparing meals, and performing other tasks as needed. James testified that she became acquainted with Cook over a period of 5 years when

James was caring for an individual who lived across the hall from Cook. James was hired by the Russos to help care for Cook in June 2017.

James testified that she became familiar with the Russos after seeing them at Cook's apartment. She testified that Cook "always talked about them, how nice they were to her, and that they looked out for her in Arizona. And she just — she thought the world of them." She testified that Cook would frequently discuss leaving the Russos her condo. James testified that Cook was "always happy" when she was with the Russos.

The Russos' daughter testified that she first met Cook during the summer of 2003. She testified that in the spring of 2016, she helped Lloyd "find an airline ticket" for him to fly to Texas to meet Cook, because Cook had gotten "confused and lost coming back from Arizona." She testified that Cook "took the wrong exit" while driving back to Nebraska from Arizona and stopped at a hotel in Texas where she contacted the Russos. The Russos' daughter testified that her parents and Cook maintained a good relationship from the time she first met Cook in 2003 until the last time she spoke with Cook.

Lloyd was called again to testify as part of the Russos' case in chief. The Russos saw Cook two to three times per week while in Arizona and occasionally while in Nebraska. Lloyd believed that Cook decided to gift the Russos her condo as a "token of her appreciation" for being her friends and spending time with her. He testified that Cook seemed happy to be gifting the Russos the condo.

Lloyd testified that he initially did not believe acting as Cook's attorney in fact would be very difficult. He testified that he was not aware of the extent of Cook's medical issues when he agreed to act as her medical attorney in fact. In comparing Cook's condition from 2015 to 2016, Lloyd testified that among other things, Cook began losing things, became forgetful, would get lost, and could not remember the location of places she had been to many times. Lloyd further testified that

these issues with Cook were not present on March 30, 2015, when the beneficiary deed granting the Russos the Arizona condo was signed.

Lloyd testified that every year Cook would drive from Nebraska to Arizona and back and that she had never gotten lost until July 2016, when she missed a turn and ended up in Amarillo, Texas. At the time, Cook had lost her wallet, had no money, and did not know where she was. A receptionist at the hotel where Cook stopped contacted Lloyd, who booked a flight to pick up Cook and drive her home. However, Cook called Lloyd the night before his flight and told Lloyd, "'I'm fine. I'm just going to drive home.'" The next morning, the hotel receptionist called Lloyd and said that Cook could not drive because she could not read the map the reception-ist showed Cook. Lloyd testified that Cook had her driver's license revoked in late 2016 because she repeatedly got lost in Omaha and called the 911 emergency dispatch service to come get her. Lloyd testified that he was unaware of the extent of Cook's issues as they were occurring and that he had attributed them to her age.

Lloyd testified that he hired Craft to help assist with mov-ing Cook to Brighton. Lloyd testified that he drove Cook to Brighton one morning, ate lunch with her, and waited for Craft to have Cook's room ready for her. Lloyd noticed Cook's hand was bruised, but Cook was unable to say what happened. A nurse offered to bring Cook some ice, but Cook refused. Lloyd denied leaving Cook at Brighton with a broken wrist, testifying that he offered to help but that Cook refused.

Lloyd admitted he browsed assisted living locations "to find the best one around," but he denied that it had anything to do with him attempting to protect his interest in Cook's condo. He testified that he hired Craft to clean out Cook's Bloomfield apartment but that after a week or so with little progress, he called "1-800-GotJunk" to clear the apartment so it could be put up for sale.

Lloyd indicated that he and Betty maintained contact with Cook even after Lloyd was replaced as attorney in fact. Lloyd testified that he and Betty would attempt to call Cook after she moved to Brighton but that they later found out Cook's telephone cord had been removed. The Russos continued to visit Cook after Craft became Cook's health care attorney in fact, but stopped trying to call.

On cross-examination, Lloyd acknowledged that he was aware there was a beneficiary for the Bloomfield unit, but nevertheless thought it was appropriate to sell it, acting as power of attorney, to save Cook the associated costs. Lloyd conceded that the situation was similar in "principle" to the sale of the Arizona condo, but distinguished the Bloomfield sale as costing Cook more per month to maintain. When asked if he thought there was anything wrong with selling the Arizona condo, Lloyd responded, "I don't know. I guess not."

Betty testified that she asked Lloyd to resign as Cook's attorney in fact because it became "very difficult" for them. She testified that on one occasion, Cook fell and the Russos took her to the hospital. Betty told Lloyd to drive home while she stayed with Cook at the hospital. When they were preparing to leave the hospital, Cook told Betty, "'I'm walking home,'" despite the fact it was around 2 a.m. and her condo was eight blocks from the hospital.

On September 22, 2017, Betty called Brighton and was told that Cook was in her room and that Betty could visit. When Betty arrived to Cook's room at Brighton, the door was locked and the Brighton staff told Betty she had to contact Cook's new attorney in fact to find out where she was. Betty determined that Cook was at a hospital and found Cook there with two black eyes, a broken nose, a broken ankle, and her arm "taped up." Betty denied that Cook ever became agitated seeing the Russos and that Cook was always glad to see them.

After the conclusion of Betty's testimony, the Russos rested. The Russos then moved for summary dismissal on the ground

that no reasonable fact finder could find otherwise than Cook lacked testamentary capacity on July 7, 2017, and that therefore, any documents executed on or after that date were invalid. Both parties delivered closing arguments, and the pending matters were taken under advisement.

On July 17, 2019, the county court issued an order directing Union Bank to distribute the funds held from the sale of the Arizona condo to the University of Nebraska Foundation. The court found that the Russos were not "real parties in interest" and lacked standing to pursue their claim for trust proceeds from the sale of the condo, and it denied the Russos' motion to disallow attorney fees. The court also made the finding that Cook's capacity was not relevant to its rulings. This appeal followed.

## ASSIGNMENTS OF ERROR

The Russos assign, restated, that the county court erred by (1) viewing the Russos' claim as a challenge to a valid trust rather than one involving a valid beneficiary deed and an improper use of a power of attorney, (2) finding that Cook was mentally competent at times relevant to this case, (3) finding that the Russos lacked standing to assert their claims, (4) failing to find that Union Bank lacked the authority and a legitimate basis to sell Cook's Arizona condo, and (5) failing to consider the issue of undue influence.

## STANDARD OF REVIEW

[1] Absent an equity question, an appellate court reviews trust administration matters for error appearing on the record; but where an equity question is presented, appellate review of that issue is de novo on the record. *In re Robert L. McDowell Revocable Trust*, 296 Neb. 565, 894 N.W.2d 810 (2017).

[2,3] When reviewing a judgment for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *In re Trust of Rosenberg*,

273 Neb. 59, 727 N.W.2d 430 (2007). An appellate court, in reviewing a judgment for errors appearing on the record, will not substitute its factual findings for those of the trial court where competent evidence supports those findings. *In re Estate of Forgey*, 298 Neb. 865, 906 N.W.2d 618 (2018).

[4] An appeal from the county court's allowance or disallowance of a claim in probate will be heard as an appeal from an action at law. *In re Estate of Karmazin*, 299 Neb. 315, 908 N.W.2d 381 (2018). In reviewing a judgment of the probate court in a law action, an appellate court does not reweigh evidence, but considers the evidence in the light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Id*. The probate court's factual findings have the effect of a verdict and will not be set aside unless clearly erroneous. *Id*.

[5] The interpretation of the words in a will or a trust presents a question of law. When reviewing questions of law in a probate matter, an appellate court reaches a conclusion independent of the determination reached by the court below. *In re Estate of Barger*, 303 Neb. 817, 931 N.W.2d 660 (2019).

## ANALYSIS

The Russos' first two assignments of error relate directly to the issue of Cook's testamentary capacity at various dates relevant to this case. First, the Russos claim the county court erred in viewing their claim as a challenge to a valid trust instead of a case involving a beneficiary deed and an improper use of a power of attorney. In doing so, they claim that Cook lacked the capacity to execute her revocable trust on March 9, 2017, and that the March 30, 2015, beneficiary deed should control the disposition of Cook's Arizona condo. The Russos' second assignment of error argues that the county court misinterpreted Nielsen's testimony in finding that Cook was competent at times relevant to this case.

As is further discussed below, we agree with the county court that the issue of capacity is not relevant to the disposition of the Russos' claims because they lack standing to assert them.

## Standing

At the heart of the Russos' appeal is the county court's determination that they were not real parties in interest and, therefore, lacked standing to assert their claims. Because we agree with the county court that the Russos lacked standing to pursue their claims, this issue is determinative of the appeal and we, therefore, affirm the county court's decision.

[6] Although the Russos maintain that the 2015 beneficiary deed controls this case, they nevertheless contend that they also have standing under the revocable trust. Neb. Rev. Stat. § 25-301 (Reissue 2016) provides that "[e]very action shall be prosecuted in the name of the real party in interest . . . ." The purpose of the real party in interest statute is to prevent the prosecution of actions by persons who have no right, title, or interest in the cause. *Cattle Nat. Bank & Trust Co. v. Watson*, 293 Neb. 943, 880 N.W.2d 906 (2016).

[7-9] The county court relied on the Nebraska Supreme Court's decision in *Manon v. Orr*, 289 Neb. 484, 856 N.W.2d 106 (2014), in concluding that the Russos lacked standing under Cook's revocable trust. In *Manon*, the Supreme Court looked to a previous version of Neb. Rev. Stat. § 30-3855 (Supp. 2019), with identical statutory language, to find the appellants lacked standing to challenge the sale of certain trust property based on the settlor's alleged incapacity. That language, found today at § 30-3855(b), provides: "While a trust is revocable, rights of the beneficiaries are subject to the control of, and the duties of the trustee are owed exclusively to, the settlor." In interpreting what today is § 30-3855(b), the Supreme Court held:

> [The statute] clearly provides that where the trust is revocable, as is the trust in this case, the settlor is in control

of the trust. The plain language of this statute suggests that the only real party in interest in a case involving a revocable trust would be the settlor of that trust, or perhaps one that represents the settlor's interests, for example, a court, a guardian or conservator, or a next friend. But plaintiffs here are contingent beneficiaries of the trust and have no real interest in the cause of action or a legal or equitable right, title, or interest in the subject matter of the controversy. This result is supported by our case law, which provides that a mere expectancy is insufficient to entitle a prospective heir to bring an action to recover property.

*Manon v. Orr*, 289 Neb. at 487-88, 856 N.W.2d at 109.

[10,11] The Supreme Court then went on to discuss the legislative history of § 30-3855(b) and the Uniform Trust Code, which previously included language that "'negate[d] the settlor's control if the settlor is incapacitated.'" *Manon v. Orr*, 289 Neb. at 489, 856 N.W.2d at 110 (quoting Unif. Trust Code § 603, comment, 7C U.L.A. 554 (2006)). In 2005, the Nebraska Legislature removed this conditional language. Based on that history, the court in *Manon* held:

This history shows that incapacity does not terminate a settlor's power to revoke a trust, though it might well affect the ability of the settlor to exercise that power. And because it does not affect the power to revoke a trust, that trust remains revocable until revoked, either by the settlor, or by another acting in the settlor's stead.

289 Neb. at 490, 856 N.W.2d at 110-11.

Under the express terms of article IX of Cook's revocable trust, the Russos' interest in the Arizona condo would not vest until Cook's death, and the trust remained revocable until that time. Based on the Supreme Court's holding in *Manon v. Orr, supra*, we agree with the county court that the Russos were merely contingent beneficiaries under the trust and had nothing more than an expectancy interest in the Arizona condo. The Russos, therefore, lacked standing to challenge the sale of the

Arizona condo under § 30-3855(b) of the Nebraska Uniform Trust Code. This result does not change regardless of whether Cook had the requisite capacity to execute the trust on March 9, 2017, because the Russos do not have standing to challenge the validity of the trust, nor the disposition of its assets.

The Russos also cite to Neb. Rev. Stat. § 30-4016 (Reissue 2016) in arguing that the county court improperly dismissed them for lack of standing. Section 30-4016 provides:

> (1) The following persons may petition a court to construe a power of attorney or review the agent's conduct and grant appropriate relief:
>
> . . . .
>
> (e) An individual who would qualify as a presumptive heir of the principal or would otherwise qualify as a devisee under a will that remains unrevoked;
>
> (f) A person named as a beneficiary to receive any property, benefit, or contractual right on the principal's death or as a beneficiary of a trust created by or for the principal that has a financial interest in the principal's estate;
>
> . . . .
>
> (h) The principal's caregiver or another person that demonstrates sufficient interest in the principal's welfare; and
>
> (i) A person asking to accept the power of attorney.

After reviewing the provisions of § 30-4016, we find that none of them confer standing upon the Russos. Section 30-4016(1)(e) pertains to a "presumptive heir," which necessarily relates to a decedent's blood relatives. The Russos are not relatives of Cook. They also were not devisees under a will that remained unrevoked upon Cook's death. Section 30-4016(1)(f) relates to individuals who possess some right "on the principal's death." As has been discussed, the Russos were not beneficiaries of Cook's revocable trust, nor the then-revoked beneficiary deed, upon her death and cannot invoke § 30-4016(1)(f) to confer standing. While Lloyd at one point

served as attorney in fact under health care and financial powers of attorney for Cook, he voluntarily resigned from these positions in July 2017, before Cook's death, and cannot be said to have been her "caregiver" or to have a "sufficient interest in the principal's welfare" to invoke standing under § 30-4016(1)(h). Finally, Lloyd and Betty at no point were asking to accept Cook's power of attorney. In fact, both sought to remove themselves voluntarily from those roles. For these reasons, the Russos' reliance on § 30-4016 to challenge the authority of Union Bank under the July 2017 financial power of attorney, which Lloyd intentionally sought out to replace him, is misplaced.

Based on the foregoing analysis, we agree with the county court that the Russos lacked standing to assert their claims.

### Russos' Remaining Arguments

The Russos also raise several issues unrelated to the question of standing. The Russos claim that the county court erred by (1) finding that Cook was mentally competent at times relevant to this case, (2) failing to find that Union Bank lacked the authority and a legitimate basis to sell Cook's Arizona condo, and (3) failing to consider the issue of undue influence. However, none of these arguments change the underlying fact that the Russos lack standing in this trust administration proceeding. Without standing to raise their claims, we need not consider the merits of these arguments.

### CONCLUSION

Based on the foregoing reasons, we agree with the county court that the Russos lacked standing to assert their claims in this matter. Therefore, we affirm the county court's dismissal of the Russos' claims for lack of standing and its denial of the Russos' motion to disallow attorney fees.

Affirmed.